UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 1:05-CR-148 |
| v. | ) | |
| | ) | *Collier\Lee* |
| FRANKLIN LAMAR KELLOGG | ) | |

## REPORT AND RECOMMENDATION

Defendant Franklin Lamar Kellogg ("Kellogg") filed a motion to suppress on April 28, 2006 [Doc. No. 30]. Kellogg claims his incriminating statements to law enforcement officers following his arrest on October 12, 2005 and his consent to search should be suppressed because they were procured in violation of his constitutional rights [*id.*]. Kellogg's motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. No. 32]. For the reasons stated herein, it is **RECOMMENDED** Kellogg's motion to suppress be **DENIED**.

## I.    *Background*

On December 13, 2005, a three count indictment was returned alleging Kellogg possessed cocaine hydrochloride with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); possessed a firearm in furtherance of the drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i); and was a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) [Doc. No. 1].

On May 26, 2006, an evidentiary hearing regarding Kellogg's motion to suppress was held. At the request of Kellogg, the parties were given until June 15, 2006 to file briefs concerning issues raised during the hearing and until June 23, 2006 to file any replies. The Court has considered all of the pleadings filed by the parties with respect to the motion to suppress [Doc. Nos. 30, 31, 35, 38, 39].

## II.    *Evidence Presented at the Hearing*

At the hearing, the government offered the testimony of Federal Bureau of Investigation ("FBI") Special Agents James J. Melia ("Melia") and Stanley Ruffin ("Ruffin"). Kellogg offered his own testimony.

### A.    *Special Agent Melia's Testimony*

After testifying about his long career in law enforcement, Melia testified about Kellogg's arrest at a duplex located at 111 Old Jasper Highway, South Pittsburg, Tennessee on October 12, 2005. Melia's first contact with Kellogg was after Kellogg had been arrested outside of the duplex by agents of the United States Marshals Service (the "Marshals") and officers of the Marion County Sheriff's Department on a warrant for a violation of the terms of his supervised release [Transcript of May 26, 2006 Suppression Hearing Proceedings, Doc. No. 37 ("Tr.") at 4-9, 26]. Previously, Melia had asked the Marshals to notify him of any arrest because Kellogg, who had a prior conviction for bank robbery, was a suspect in an armed robbery of a bank in Guntersville, Alabama [*id.* at 8-9]. Melia was looking for Kellogg in order to question him about the bank robbery in Alabama [*id.*]. On October 12, 2005, Melia learned Kellogg had been arrested, and Melia and Ruffin drove to the scene of the arrest [*id.* at 9].

When Melia and Ruffin arrived at the scene of arrest around 7:15 p.m., Central Time [*id.* at 95], Kellogg was already handcuffed and in the custody of the Marshals and Marion County officers [*id.* at 9, 25-26]. Melia stated the Marshals reported they had performed a security sweep of the duplex when they arrested Kellogg and there was contraband in the duplex from which Kellogg was seen leaving prior to being arrested [*id.* at 9, 99-100].

After Melia was given a briefing about the arrest, he decided to seek consent to search the

duplex [*id.* at 9]. The duplex was occupied by the lessee, Tiffany Huckaby ("Huckaby"), who told Melia she did not really know Kellogg, but he had been staying with her for a couple of days [*id.* at 9-10]. Melia sought and obtained permission from Huckaby to search the entire residence [*id.*]. Even though he had the consent of Huckaby, Melia also wanted Kellogg's consent in case it was needed [*id.* at 99, 103].

Melia introduced himself to Kellogg, told him he was under arrest for a probation violation, told Kellogg he was a suspect in the Alabama bank robbery, and he asked for consent to search the duplex [*id.* at 17-18, 27, 103-04]. Kellogg was uncuffed to sign the consent to search form [*id.* at 10, 17], and the executed form was introduced at the hearing as Government's Exhibit 1. It is Melia's normal practice to ask if a person can read, and even if that person can read he also many times reads the form aloud to them [*id.* at 12, 34]. Melia, however, could not remember if he read the form aloud to Kellogg [*id.*]. When Melia asked Kellogg for consent to search, Kellogg had not yet been advised of his *Miranda* rights by the agents, because Kellogg was not being "questioned" [*id.* at 103].

In response to Melia's request for consent to search, Kellogg said "this stuff" was not necessary, anything illegal in the apartment was his, he did not want the girl he was staying with to get into any trouble, and he told Melia the exact location of the cocaine and guns found during the search of the duplex [*id.* at 15, 17, 26-27, 103-04]. When recalled as a rebuttal witness, Melia testified he responded to Kellogg's response to the request for consent to search by stating, "Okay, Mr. Kellogg, then we need to go over the consent to search form, we need to read you your rights. Let's get that done, and you know, we'll get the search done and we'll get back to Chattanooga." [*id.* at 104].

3

Kellogg told Melia the cash drawer from the bank robbery was not in the house, and he had gotten rid of it [*id.* at 15-16]. Melia testified all of the items of evidence identified by Kellogg were located where Kellogg stated they would be, with the exception of cash which was found in Kellogg's pocket not in the duplex [*id.* at 17]. Kellogg said the money in his pocket was not from the robbery, but was from something else [*id.* at 21].

It is Melia's typical practice to always read *Miranda* warnings to a suspect prior to questioning [*id.* at 13]. Melia stated he always reads the advice of rights and waiver form aloud to a suspect even if the suspect can read, but he was not certain whether it was he or Ruffin who read the form aloud to Kellogg [*id.* at 34-35]. Kellogg signed the waiver contained on the advice of rights and waiver form acknowledging he had been given *Miranda* warnings and waived his rights, and the signed form was introduced as government's Exhibit 2 [*id.* at 14]. Melia initially could not remember for certain which form Kellogg signed first stating to the best of his recollection Kellogg signed the consent to search form first [*id.* at 28]. During his testimony as a rebuttal witness, however, Melia stated Kellogg executed both the consent to search form and the advice and waiver of rights form contemporaneously and prior to any questioning by him [*id.* at 97-99]. When Kellogg signed the forms, there were no guns drawn on Kellogg and no yelling or coercion [*id.* at 16].

Melia testified he had no indication Kellogg was intoxicated or under the influence of any drugs or alcohol [*id.* at 12-13]. He stated Kellogg was calm, gentlemanly, polite and never became angry [*id.* at 16, 26]. Melia testified Kellogg was able to follow Melia's instructions and respond appropriately at the time Kellogg signed the consent and advice and waiver forms [*id.* at 13, 15-16]. Kellogg was able to stand under his own power and comprehend Melia's questions [*id.* at 13]. Melia agreed there are types of intoxicants that might not be easily detected absent a blood test, and that

4

he was not specifically trained regarding types of medication or drugs a person might be taking [*id.* at 28-30].

Melia and Ruffin also had further conversation with Kellogg during the approximately 45 minute drive from Jasper to the FBI's offices in Chattanooga [*id.* at 17]. During the drive to Chattanooga, the agents stopped at a McDonald's and bought Kellogg a fast food dinner and drink [*id.* at 17-18]. Once the agents arrived at their Chattanooga office, Kellogg ate his dinner and further questioning took place [*id.* at 18].

In the FBI offices, Melia asked Kellogg about the bank robbery in Alabama [*id.* at 18]. Melia testified Kellogg knew he was in major trouble because he had been caught with a gun and drugs, and said the bank robbery could be "closed" on him [*id.* at 18]. Kellogg also stated a ballistics test would show the bullet from the gun seized at the duplex would match the one fired at the scene of the bank robbery in Alabama [*id.* at 18-19, 32]. However, Kellogg did not want to talk in detail about the robbery [*id.* at 18]. Kellogg never told the FBI agents he was drunk or using drugs, never said he wanted to stop talking, and he never asked for an attorney [*id.* at 19, 33]. When asked if he wanted to cooperate, Kellogg indicated his cooperation would not matter because he probably would be going to prison for the rest of his life [*id.* at 20-21].

Melia and Ruffin were attired in street clothes [*id.* at 16]. Ruffin, who was in charge of gathering evidence once the search began, was present during the entire time Melia spoke with Kellogg [*id.* at 33].

### B.    *Kellogg's Testimony*

Kellogg stated he was intoxicated on October 12, 2005 because he had taken three Xanax or "blue footballs" about twenty minutes prior to his arrest by the Marshals, which made him slow

and depressed [*id.* at 42-43]. Kellogg got the Xanax from a person on the street that he did not know [*id.* at 46]. Kellogg took the Xanax about one and one-half hour prior to the arrival of Melia [*id.*]. Kellogg recalled seeing Melia the day of his arrest, but testified he did not give consent to search or waive his *Miranda* rights, because he was not in the "right frame of mind" to waive his rights [*id.* at 43-44]. Kellogg acknowledged he saw and signed the consent and waiver forms on October 12, 2005, but he asserted he did not know what he was signing [*id.* at 44-45]. Kellogg recalls he was told about or read his rights in the car on the way back to Chattanooga [*id.*].

When Kellogg was asked for consent to search, he told Melia and Ruffin he could not give consent to search because it was someone else's home [*id.* at 51-53]. Kellogg acknowledged reading and then signing the consent to search form [*id.* at 51-55]. However, because he believed he could not give consent to search the duplex, he thought when he signed the consent to search form he was only giving consent to search his person [*id.*]. Kellogg testified he understood the difference between consent to search the duplex and consent to search his person even on three Xanax [*id.* at 52-53].

Kellogg denied telling Melia where to find the cocaine that was seized from the duplex [*id.* at 47]. Kellogg stated he had no knowledge cocaine was present, so he could not have told Melia where to find the cocaine [*id.* 47-48]. He denied talking to Melia about the gun, drugs, or bank robbery [*id.* at 50-51, 65-66], but said he told Melia to let the girl back into her home because she had not done anything wrong and he was the only person in the house that was "so-called illegal" [*id.* at 59].

Kellogg stated that, while neither Melia nor Ruffin drew their guns on him [*id.* at 57], he felt coerced into answering questions in order for Huckaby to be allowed to return to her home [*id.* at

59-60]. Specifically, Kellogg testified Melia said he wanted to search the duplex and he would hate to have to call children's services to take Huckaby's children and he would hate to have to get a search warrant, but Kellogg could "get this over with" and get back to Chattanooga as quick as possible [*id.* at 61]. Kellogg said these statements by Melia were made in relation to searching the house and questions about the bank robbery [*id.* at 61].

Kellogg stated that by the time the agents arrived, he had been in a car at the duplex for one and one-half to two hours and he was agitated, aggravated, and depressed [*id.* at 59-60]. Kellogg thought Melia and Ruffin were merely giving him a ride to Chattanooga, and he did not agree to talk with them [*id.* at 57-59]. Kellogg agreed he was not threatened in the car or in the FBI offices [*id.* at 62-63]. While they were in the car returning to Chattanooga, Kellogg told Melia and Ruffin he was thirsty and, as a result, the agents bought him a meal and a drink [*id.* at 62].

At the FBI offices, Kellogg told Melia and Ruffin he did not know about the bank robbery and did not want to talk about guns or drugs [*id.* at 63-64]. Kellogg admits he did not request a lawyer [*id.* at 64]. Kellogg also acknowledged he was permitted to make phone calls. He stated he made two phone calls, one to his brother from the car and one to his girlfriend before he left the FBI office [*id.* at 66-67].

Kellogg has prior felony drug, armed bank robbery, and gun convictions, and was on supervised release at the time of his arrest [*id.* at 45].

### C.    *Special Agent Ruffin's Testimony on Rebuttal*

Ruffin testified as a rebuttal witness for the government. Ruffin stated he was at home in Chattanooga when he received a call because Kellogg had been arrested [*id.* at 74]. Ruffin stated when he and Melia arrived at the scene of arrest, Kellogg was standing outside the duplex being

7

guarded by a Marshal [*id.* at 75]. Ruffin did not perform a pat down search of Kellogg as he assumed Kellogg already had been searched by the Marshals [*id.*].

Ruffin was with Melia when Melia spoke with Kellogg [*id.* at 70]. Ruffin testified Kellogg was not threatened in any way by anyone [*id.* at 70, 74]. Ruffin observed Kellogg sign the consent to search form when he was asked for consent by Melia [*id.* at 70, 74, 79]. Ruffin could not remember whether Kellogg read the form or the form was read aloud [*id.* at 79-80]. Ruffin stated the address of the duplex was filled-in on the consent to search form before Kellogg signed it [*id.* at 71]. Around the time Kellogg signed the consent to search form, Kellogg was also asked a general question about whether there were any firearms, drugs, or paraphernalia in the duplex for safety reasons [*id.* at 80-81]. Kellogg responded by telling the agents where to find the gun and contraband in the duplex [*id.* at 72]. The agents then searched the duplex and located a firearm and other evidence [*id.* at 81-82].

Ruffin testified Kellogg's behavior was not consistent with being under the influence of either drugs or alcohol [*id.* at 71, 84-85]. Kellogg's behavior was cordial and cooperative, and Kellogg said he did not want Huckaby to get into any trouble [*id.* at 71-72].

Ruffin stated Kellogg was informed of his rights and signed the advice and waiver of rights form before he was questioned [*id.* at 72-73, 82-83]. Ruffin could not recall if the advice and waiver of rights form was signed prior to leaving for Chattanooga or on the way to Chattanooga [*id.* at 83]. Ruffin's recollection was that Kellogg signed the consent to search form first and then signed the advice and waiver of rights form [*id.* at 70-73]. Ruffin testified the advice and waiver of rights form was signed prior to Kellogg's statements [*id.* at 73]. Kellogg never asked for a lawyer [*id.* at 74].

Ruffin took custody of the evidence seized at the duplex [*id.* at 76]. Ruffin introduced into

evidence two forms that were prepared by him, an evidence sheet and a report on the evidence seized, which were admitted as government's exhibits 3 and 4. Ruffin prepared these forms on October 13, 2005 [*id.* at 86-89, 94]. Ruffin stated he believes the times recorded on these two forms were Central Time; however, the times recorded could have been Eastern Time [*id.* at 89-95].

Ruffin agreed with Melia's description of Kellogg's demeanor as calm [*id.* at 84]. Ruffin stated Kellogg never asked the agents to stop the questioning and the questioning simply came to an end at its natural conclusion at the FBI offices in Chattanooga [*id.* at 85].

## III.    *Analysis*

Kellogg is seeking to suppress all statements made by him after and during his arrest because the agents allegedly failed to administer a timely *Miranda* warning, and, in any event, Kellogg was so intoxicated he could not make voluntary statements and an intelligent waiver of his rights [Doc. Nos. 30 and 38].[1]

### A.    *Credibility*

As is often the case, the credibility of the witnesses is at issue because the agents' testimony contradicts Kellogg's testimony with respect to certain events. Having had the opportunity to observe Kellogg's demeanor and testimony, the Court finds Kellogg was not a credible witness. This conclusion as to Kellogg's credibility is buttressed by the inconsistencies in his testimony at the hearing. For instance, Kellogg testified he lacked the capacity to voluntarily and intelligently give consent to search or waive his *Miranda* rights because he was not in his "right frame of mind" due to the Xanax he had allegedly consumed. Yet, he also testified that when asked for consent to

---

[1] While Kellogg contends his consent to search was invalid, he is not seeking to suppress the evidence seized from the duplex [*see* Tr. at 23-24].

search the duplex, he told the agents he could not give consent because he was not the owner of or did not live at the residence.[2] Thus, by his own admission, and despite allegedly consuming three Xanax, Kellogg had the presence of mind to tell the agents his consent was not necessary and he could not give consent because he was not the owner or a resident of the premises to be searched.

The agents' testimony of events and Kellogg's actions and demeanor, including their testimony they had no indication Kellogg was under the influence of drugs or intoxicated, was credible, consistent, and clear. While the agents' testimony regarding exactly when the advice and waiver of rights form was *signed* was somewhat uncertain and inconsistent, the agents' testimony Kellogg was informed of his rights prior to "questioning" was consistent and credible. The issue of whether the agents are correct that certain of their questions do not constitute "questioning" (*i.e.*, custodial interrogation) is addressed below.

**B.    Statements Made by Kellogg**

It is well established "incriminating statements elicited from suspects in custody cannot be admitted at trial unless the suspect was first advised of his or her *Miranda* [*v. Arizona*, 384 U.S. 436 (1966)] rights." *United States v. Salvo,* 133 F.3d 943, 948 (6th Cir.1998) (citing *Stansbury v. California,* 511 U.S. 318, 322 (1994)). A defendant may waive his *Miranda* rights, but the waiver must be voluntary, knowing, and intelligent, based on the totality of the circumstances. *Moran v. Burbine,* 475 U.S. 412, 421 (1986). The government has the burden of proving by a preponderance

---

[2]  Kellogg claims when he signed the consent to search form he was under the impression he was only giving consent to search his person, not the premises. Ruffin testified that when Kellogg signed the consent to search form, the address of the premises to be searched was already on the form, which clearly states it authorizes "a complete search of my premises at 111 Old Jaspar [sic] Road, South Pittsburg, Tennessee." Government Exhibit 1 at 1. Kellogg admitted reading the consent to search form before signing it; however, he claimed not to understand it because of the effects of the Xanax. The Court finds Kellogg's assertion that he read and signed the form, but did not understand it, is not credible.

of the evidence that the waiver was voluntary; however, in order for the waiver to be involuntary, there must be "an element of police coercion." *Seymour v. Walker,* 224 F.3d 542, 554 (6th Cir. 2000) (citing *Colorado v. Connelly,* 479 U.S. 157, 169-71 (1986)). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran,* 475 U.S. at 421 (quoting *Fare v. Michael C.,* 442 U.S. 707, 725 (1979)).

### 1. *Statements Made Prior to Miranda Warnings*

The first question for resolution with respect to Kellogg's motion is whether Kellogg's statements in response to Melia's initial question to Kellogg about consent to search should be suppressed. It is undisputed that when Melia and Ruffin first approached Kellogg on the evening of October 12, 2005, Kellogg was already in custody and under arrest for a probation violation. Based upon the testimony, the Court concludes Kellogg was not given a *Miranda* warning prior to being asked for consent to search. The Court also concludes, however, Melia's request for consent to search was not an interrogation.

If law enforcement officers interrogate a suspect in custody before informing him of his rights to remain silent and to have the presence and assistance of retained or appointed counsel during any custodial interrogation, "*Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the [government's] case in chief." *Oregon v. Elstad,* 470 U.S. 298, 317 (1985). "Custodial interrogation" has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. "A suspect is 'in custody' for purposes of receiving *Miranda* protection if there has been a 'formal

11

arrest or restraint on freedom of movement.'" *Mason v. Mitchell,* 320 F.3d 604, 631 (6th Cir. 2003) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977) (per curiam)). "Interrogation" includes both express questioning and its functional equivalent, which includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 300-01 (1980).

When determining whether police activity constitutes interrogation of a suspect in custody within the meaning of *Miranda,* "courts should carefully scrutinize the factual setting of each encounter of this type." *United States v. Avery,* 717 F.2d 1020, 1025 (6th Cir. 1983), *cert. denied,* 466 U.S. 905 (1984). It has been held, "an officer's request to search does not constitute interrogation under the Fifth Amendment." *Wilson v. City of Chanute,* 43 F. Supp. 2d 1202, 1210 (D. Kan. 1999) (citing *United States v. McCurdy,* 40 F.3d 1111, 1118 (10th Cir. 1994)). *See also United States v. McClellan,* 165 F.3d 535, 544 (7th Cir. 1999) ("consent to search is not an interrogation within the meaning of *Miranda*" because the giving of such consent is not a self-incriminating statement) (quoting *United States v. Shlater,* 85 F.3d 1251, 1256 (7th Cir. 1996)).

Even if a defendant is in custody and has not been given the *Miranda* warnings, his statements are admissible if they are volunteered. *United States v. Jones,* 128 Fed. Appx. 490, 494 (6th Cir. Apr. 19, 2005); *United States v. Crowder,* 62 F.3d 782, 786 (6th Cir. 1995), *cert. denied,* 516 U.S. 1057 (1996) (citing *Oregon v. Elstad,* 470 U.S. 298, 307-09 (1985)). In *Jones,* an FBI Special Agent and a Memphis Police Officer went to the defendant's college dormitory room to execute a warrant for his arrest on a charge of aggravated sexual battery upon a child. *Jones,* 128 Fed. Appx. at 491. The officers went to defendant's dormitory room, knocked, entered after hearing

12

the defendant say "come in," and observed the defendant using a computer for instant messaging on the internet. *Id.* The officers introduced themselves and told the defendant they wanted to talk to him about a complaint involving the transmission of sexually explicit images, to which he responded, "You're going to find bad pictures on my computer." *Id.* at 491-92. The officers told the defendant they were not interested in images which involved adults and began to read an advice of rights form when the defendant interrupted them stating, "Well, no, you're going to find bad pictures of children." *Id.* at 192. At that point, the officers completed reading aloud the printed advice of rights form and the defendant read it and signed a waiver of rights. *Id.* The Sixth Circuit upheld the denial of the defendant's motion to suppress concluding that even if the defendant was in custody and had not been given *Miranda* warnings, the defendant's incriminating statements were volunteered. *Id.* at 494-95.

Similarly, in this situation, Melia and Ruffin approached Kellogg, who was in custody, and asked for his consent to search before a *Miranda* warning was given to Kellogg. Kellogg's response, *i.e.*, that anything illegal in the duplex was his,[3] was a volunteered statement. When Melia asked for consent to search, he could not have anticipated the question was likely to elicit an incriminating response from Kellogg; but, instead, could have reasonably expected a "yes" or "no" response from Kellogg. Thus, Kellogg's statement in response to Melia's request for consent to search (that anything illegal in the duplex was his) was a voluntary statement Melia could not have expected to elicit in response to his request for consent to search.

The next question for resolution is whether Kellogg's response to the question about whether

---

[3] Remaining factual disputes concerning exactly what was said in response to Melia's request for consent are a matter for trial. To the extent it relates to credibility, however, the Court concludes the agents' testimony about Kellogg's response is credible.

there were guns, drugs or drug paraphernalia in the duplex should be suppressed. The government contends the agents' testimony was consistent that the advice of rights and waiver form was signed before their questioning elicited statements regarding the specific locations of the contraband [Doc. No. 39]. Contrary to the government's assertions, the record is *not* clear as to whether Kellogg was given a *Miranda* warning and waived his rights prior to being asked about whether there were guns, drugs or drug paraphernalia in the duplex.

In Melia's direct testimony, he testified Kellogg told the agents where contraband would be found in the residence [Tr. at 15], but Melia was not specifically asked whether Kellogg had been informed of and waived his *Miranda* rights at that time. In his rebuttal testimony, Melia testified he would never question a person in custody without first obtaining a *Miranda* rights waiver, but it is not clear whether he considers an inquiry about guns and contraband in the house to constitute "questioning"[*see, e.g.,* Tr. at 15-17, 26-27, 98-99, 103-104].

Ruffin testified in rebuttal that Kellogg was informed of his rights before he started answering questions at the residence [Tr. at 72]. Ruffin also testified that around the time Kellogg signed the consent form the agents asked Kellogg:

> I can't recall the exact question, but it was just a general thing, is there anything in there that we need to know about, are there any firearms? We typically will ask that because of safety, if there are firearms present, and we want to make sure that they're rendered safe. It was just a general question about whether or not there were firearms or drugs or any paraphernalia like that.

[Tr. 81].

Even assuming the agents asked Kellogg whether there was anything dangerous in the residence prior to giving the *Miranda* warnings and obtaining a waiver of rights, suppression is not

14

appropriate under the limited "public safety" exception to *Miranda* recognized by the Supreme Court in *New York v. Quarles*, 467 U.S. 649, 656 (1984). In *Quarles*, the Supreme Court held "there is a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence and . . . the availability of that exception does not depend upon the motivation of the individual officers involved." *Id.* In recognizing the "public safety" exception, the Supreme Court stated it did "not believe the doctrinal underpinnings of *Miranda* require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety." *Id.* The "public safety" exception applies not only to protect the safety of the public, it also applies to protect the safety of the arresting officers. *United States v. Mendoza*, 333 F. Supp. 2d 1155, 1161 (D. Utah 2004) (citing *United States v. Lackey*, 334 F.3d 1224, 1228 (10th Cir.), *cert. denied*, 540 U.S. 997 (2003)).

In *Lackey*, the police obtained a state arrest warrant for the defendant, went to the apartment building where he was believed to be living, saw a man resembling defendant approach a car and enter it, approached the man, asked his name, and after learning it was the defendant, informed him he was under arrest. 334 F.3d at 1225. After being handcuffed, but before he was patted down or given *Miranda* warnings, the defendant was asked if he had any guns or sharp objects on his person. *Id.* The defendant responded he had nothing on his person, but there was a gun in his car. *Id.* at 1225-26. The defendant then gave consent to search his vehicle. On appeal, the Tenth Circuit upheld the district court's denial of the defendant's motion to suppress based, in part, upon the district court's conclusion the question as to whether the defendant had any weapons or sharp objects on his person was within the "public safety" exception to the *Miranda* requirement. *Id.* at 1226. The Tenth Circuit stated:

the reasoning of *Quarles* applies squarely to the circumstances here. The focused question of the officers – "Do you have any guns or sharp objects *on you*" – addressed a real and substantial risk to the safety of the officers and Defendant... It is irrelevant that the principal danger in this case was the risk of injury to the officers or Defendant himself, rather than ordinary members of the "public."... the concern of the public-safety doctrine extends beyond safety to civilians. The exception undoubtedly extends to officers' "questions necessary to secure their own safety."

*Id.* at 1227-28 (quoting *Quarles*, 467 U.S. at 659).

In *Mendoza*, law enforcement officers arrested defendant in his home pursuant to an arrest warrant. During the arrest, officers performed a protective sweep in order to secure the premises while the police were present. 333 F. Supp. 2d at 1158. The protective search was limited to places where persons could be hiding; and, it resulted in the seizure of two rifles and some ammunition from a walk-in closet. *Id.* After the protective sweep and before the defendant was given the *Miranda* warnings, an officer asked the defendant if there were other guns in the house. *Id.* The defendant indicated there was a firearm hidden under a mattress in one of the bedrooms. *Id.* The district court found the defendant's statement about the gun hidden under the mattress should not be suppressed even though he had not been given *Miranda* warnings because the officers had a reasonable belief, despite the protective sweep, that other firearms might be present and would pose a threat to the officers and the other persons in the home. *Id.* at 1161. The district court stated:

It would be unwise to elevate *Miranda* rights to so high a level that it requires police to operate in dangerous circumstances without the ability to seek information about the threats they face.

*Id.* at 1162.

Likewise, in *United States v. Talley*, 275 F.3d 560, 561 (6th Cir. 2001), law enforcement

16

officers executed an arrest warrant for Cothran at his residence. After knocking on the door of Cothran's apartment, the officers heard the sounds of running. *Id.* at 562. They donned bullet proof vests and turned off the electricity to the apartment. *Id.* As they entered the apartment, they arrested Cothran and Talley, who also was in the residence. At that point, one of the officers stepped into the residence, and observed bullets and a magazine for a semiautomatic pistol in plain view. *Id.* After all the individuals in the apartment had been secured, one of the officers asked, "Where is the gun?" *Id.* Talley responded it could be found in the vacuum cleaner. *Id.* The district court granted Talley's motion to suppress his statement concerning the location of the gun because he had not received *Miranda* warnings at the time he and the others present in the apartment were asked about the location of the gun. The Sixth Circuit reversed and held: "Once Officer Rush had seen the magazine [and ammunition], he had reason to believe a gun was nearby and was justified under *Quarles*, in asking his question prior to administering a *Miranda* warning." *Id.* at 564.

In this situation, Kellogg was under arrest when Melia and Ruffin arrived on the scene; and, after Kellogg's arrest on the warrant for the probation violation, a protective sweep of the premises had been performed. Nevertheless, when Kellogg was asked for consent to search the premises, Kellogg responded that anything illegal in the apartment was his. Further, Melia and Ruffin were present because Kellogg, who had a prior conviction for bank robbery, was a suspect in an armed robbery of a bank in Alabama. Kellogg's response to the agents' request for consent to search the premises, considered in light of their knowledge that Kellogg was the suspect in an armed bank robbery, would have created a reasonable suspicion there might be firearms, or other dangerous instrumentalities, in the residence. Thus, even assuming Kellogg had not been given a *Miranda* warning prior to the point in time he was asked if there was anything such as a gun or other

contraband in the residence, the question falls within the "public safety" exception to the *Miranda* requirement. The agents reasonably could have asked the question of Kellogg not only to protect their own safety and the safety of the other law enforcement officers present, but also to secure the safety of Huckaby and the children who apparently were present.

Furthermore, and as suggested in *Lackey*, ruling otherwise would do little to protect an arrestee's privilege against self-incrimination. 334 F.3d at 1228. As the Tenth Circuit noted under the facts in *Lackey*, the purpose of the question "Do you have any guns or sharp objects on you?" was to protect the officers, not to obtain incriminating evidence, because the officers had the right to search the defendant's person pursuant to his arrest. *Id.* Likewise, the agents had already obtained the consent of at least Huckaby to search the residence; and, when they asked Kellogg for his consent, he volunteered that anything illegal in the residence was his. Thus, the question as to whether there were guns, drugs or drug paraphernalia present was not asked for the purposes of acquiring incriminating evidence – the incriminating evidence in the residence could have been located as the result of the consent search of the residence – it was to protect the safety of the law enforcement officers and others present.

## 2. Statements Made After Miranda Warnings

The Court finds Kellogg's remaining statements to the agents were made after he was given *Miranda* warnings and waived his *Miranda* rights. Where a defendant has been advised of his *Miranda* rights, his subsequent responses to custodial interrogation may be used against him if he voluntarily, knowingly, and intelligently waives his right to remain silent and to have a lawyer present when responding to questions. *Miranda*, 384 U.S. at 444. The Sixth Circuit has stated trial courts should consider the following factors on this point:

18

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the investigation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Machaeck v. Hofbauer*, 213 F.3d 947, 954 (6th Cir. 2000) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

After being given the *Miranda* warnings and signing the consent form, Kellogg continued to speak with Melia and Ruffin at the scene of his arrest, during the approximately 45 minute drive to Chattanooga, and at the FBI offices in Chattanooga. He also signed the advice and waiver of rights form. Although Kellogg had significant experience with law enforcement based on his prior convictions, Kellogg never invoked his right to remain silent and never asked for an attorney.

Kellogg argues his statements and waiver were not voluntary because he was under the influence of three Xanax he allegedly took prior to his arrest. It is well settled "a confession cannot be used if it is involuntary." *United States v. Macklin,* 900 F.2d 948, 951 (6th Cir.1990), *cert. denied,* 498 U.S. 840 (1990) (*citing United States v. Washington,* 431 U.S. 181, 186-87 (1977)). A confession is involuntary, however, only if there is (1) police coercion or overreaching that (2) overbore the accused's will and (3) caused the confession. *See Colorado v. Connelly,* 479 U.S. 157, 165-55 (1986); *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999); *United States v. Brown,* 66 F.3d 124, 126-27 (6th Cir.1995).

The Supreme Court had not addressed the effect of intoxication on the voluntariness of a waiver of rights after a *Miranda* warning. Citing *Connelly,* the Sixth Circuit has concluded

19

intoxication, standing alone, is not determinative of whether a confession was voluntary. *United States v. Jones,* No. 90-3693, 1991 WL 105751, * 3 (6th Cir. Jun. 18,1991); *Marcum v. Knight,* No. 89-6192, 1991 WL 1106, * 3 (6th Cir. Jan. 8, 1991). In both cases, the Sixth Circuit held that without coercive police activity, intoxication does not render a confession involuntary. *Id.* "Coercion by law enforcement agents has to be the 'crucial motivating factor' behind a defendant's decision to confess in order for the confession to be suppressed." *U. S. v. Soto* 124 Fed. Appx. 956, 964, 2005 WL 548786, * 7 (6th Cir. 2005) (quoting *McCall v. Dutton,* 863 F.2d 454, 459 (6th Cir.1988)); *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (threshold to determination confession was involuntary is requirement that police extorted the confession by means of coercive activity).

Kellogg could not identify the person who allegedly provided the Xanax to him. Even assuming he was under the influence of Xanax, his claim the Xanax rendered him incapable of a voluntary consent and waiver is not credible, especially in light of the testimony of both agents that Kellogg did not appear to be under the influence of drugs or intoxicated. The evidence shows that, even if he did take the Xanax as alleged, Kellogg was capable of executing forms, identifying where evidence would be found, distinguishing between consent to search a premise and a person, understanding the potential impact of cooperation, talking on the telephone, eating dinner, and engaging in a calm, cordial conversation with the agents. Even considering only Kellogg's testimony concerning what he understood about the effect of his consent to search and the potential impact of his cooperation given his history of convictions, demonstrates Kellogg was able to understand and waive his rights.

In addition, Kellogg's claim his cognitive or volitional ability was impaired by Xanax is

20

insufficient to demonstrate his statements were involuntary without coercion. Simply put, there is no credible evidence of any coercion by law enforcement agents, and Kellogg's alleged intoxication, without coercion, does not render his statements involuntary, and he cites no cases to the contrary in his argument. Instead, Kellogg claims the circumstances of his arrest and interrogation amount to coercive government conduct because Melia essentially threatened to bring in children's services to take Huckaby's children and to delay Kellogg's return to Chattanooga. Even if true, such actions do not constitute (1) police coercion or overreaching that (2) overbore the Kellogg's will and (3) caused his confession/incriminating statements based upon the totality of the circumstances. Indeed, Huckaby claimed to not know Kellogg well, so it is difficult to imagine how a reference to bringing in children's services would coerce Kellogg.

The evidence demonstrates the agents, who had no indication Kellogg was under the influence of drugs, were reasonable and accommodating in their dealings with Kellogg. Kellogg acknowledged the agents never drew their guns on him, bought him a meal and a drink when he stated he was thirsty, and permitted him to make two phone calls. There is nothing coercive about these circumstances, and in the absence of law enforcement coercion, Kellogg's alleged intoxication cannot negate the voluntariness of his statement.

*IV.*     *Conclusion*

For the reasons explained above, I **RECOMMEND**[4] Kellogg's motion to suppress [Doc. No. 30] be **DENIED**.

s/*Susan K. Lee*
_____

SUSAN K. LEE

UNITED STATES MAGISTRATE JUDGE

---

[4] Any objections to this report and recommendation must be served and filed within ten days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

22